**Moses G. MANGRUM, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 79–430.

District of Columbia Court of Appeals.

Argued Jan. 24, 1980.

Decided Aug. 20, 1980.

---

Lawrence P. Postol, Washington, D. C., appointed by the court, for appellant.

E. Anne McKinsey, Asst. U. S. Atty., Washington, D. C., with whom Carl S. Rauh, U. S. Atty. at the time the brief was filed, John A. Terry, Michael W. Farrell and Robert St. John Roper, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, KERN and HARRIS, Associate Judges.

KELLY, Associate Judge:

Appellant Moses G. Mangrum challenges his jury convictions for assault with intent to kill while armed[1] and carrying a pistol without a license.[2] His arguments on appeal are: (1) that his trial counsel deprived him of his Sixth Amendment right to the effective assistance of counsel by failing to investigate or present an insanity defense or to request exculpatory prosecution material under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (2) that the government's failure spontaneously to inform appellant that the victim did not identify him from the first of two photographic arrays violated his Fifth Amendment due process right. *Brady v. Mary-*

*land, supra.*[3] Unpersuaded by either of appellant's arguments, we affirm.

At trial, Louis Ronald Dalton and James Harper testified that, on the evening of July 15, 1977, while walking down Tenth Street, N. E., appellant stopped them and, without provocation or apparent motive, threatened to shoot them. Harper fled across the street and watched from behind a truck as appellant shot Dalton in the hand and chest.

Dalton was hospitalized, in serious condition. Later that night, he described his assailant, in considerable detail, to Metropolitan Police Detective John E. Aduddell.

Harper spotted appellant on the street the next day and called the police. When Detective Aduddell arrived, Harper pointed appellant out to him.[4]

On July 18, Dalton selected appellant's photo from one of the arrays brought to the hospital by Detective Aduddell. *See* note 3 *supra.* Appellant was arrested the next day.

On August 4, both Dalton and Harper identified appellant at lineups; they also identified him in court on March 23, 1978.[5]

---

1. D.C.Code 1973, §§ 22–501, –3202.

2. D.C.Code 1973, § 22–3204.

3. The victim, Louis Ronald Dalton, was shown two photographic arrays on July 18, 1977. The defense, however, did not learn that there were two arrays until after trial. Apparently, the first consisted of color slides; the second contained black and white pictures. The array from which an identification was made (the second) was not preserved, despite the government's duty to preserve such arrays, *see Washington v. United States*, D.C.App., 377 A.2d 1348, 1351 (1977), but the government conceded (in its opposition to appellant's motion for a new trial) that only appellant's photo appeared in both arrays and (in its argument on appeal) that appellant's photo was first chosen from the second array.

   At trial, Dalton testified that he said, "I think that's him," identifying appellant's photo from the array. Asked why he used that expression, he answered: "Well, identifying someone from a picture in a case like this was to me a very serious thing. . . . It was a very serious thing. I took that into consideration. I think that if there was some hesitancy in saying I

think this is he, it's because to me that was a very serious thing to do. I think I realized the gravity of what I was doing."

   On cross–examination, asked whether the medication he was taking in the hospital might have affected his judgment, he answered: "No, I think that I tried to make clear a few moments ago that I was–I realized this is very serious to identify someone from a group of pictures, and I took my time, and I looked . . through all the pictures very closely and very slowly."

4. Harper testified that at first he was 90% sure that appellant was his assailant but that he then saw appellant "standing up and at that point [he] was absolutely sure." Sometime before the lineup, Dalton again saw appellant on the street and called the police. (It appears that Dalton and appellant were neighbors on the same block; however, Dalton testified that he had never seen appellant before the July 15 incident.)

5. On cross–examination, Dalton was asked whether he was "positive that the [appellant] who is sitting here, [was] the man who shot

■ Notice of an insanity defense was filed on October 4, 1977; appellant was committed to St. Elizabeths Hospital on December 12, 1977, for psychiatric examinations.[6]

St. Elizabeths' February 1, 1978 report, filed on February 7, diagnosed a "non–psychotic organic brain syndrome with epilepsy." It concluded that defendant was competent to stand trial; that his mental defect "did not result in substantial impairment of [his] behavioral controls;" that "the alleged offense, if committed by the patient, was not the product of [that] . . . defect;" and that appellant "had the capacity to appreciate the wrongfulness of his conduct and was able to conform [it] to the requirement of the law."

■ At a competency hearing on February 28, 1978, appellant's counsel reserved the right to raise an insanity defense at or after trial. Appellant, on the other hand, made it clear that he wished to rely on an alibi defense.[7]

On the first day of trial, counsel informed the court that he was dropping the insanity defense because he had "no medical evidence to contradict the findings that have been made about Mr. Mangrum."

### Ineffective Assistance of Counsel

■ Appellant's burden of demonstrating that he was denied the effective assistance of counsel is heavy. *See Oesby v. United States*, D.C.App., 398 A.2d 1, 3–4 (1979) (he must demonstrate that counsel's "gross incompetence . . . has in effect blotted out the essence of a substantial defense") (citing *Angarano v. United States*, D.C. App., 312 A.2d 295 (1973), *rehearing denied*, 329 A.2d 453 (1974) (en banc) (adopting the standard in *Bruce v. United States*, 126 U.S.App.D.C. 336, 339–40, 379 F.2d 113, 116–17 (1967)).

■ The remedy of a new trial is granted only in exceptional cases, where the "substantial defense lost due to incompetence [is] shown to be a defense as a matter of law and available from facts known or obvious to the trial attorney." *Woody v. United States*, D.C.App., 369 A.2d 592, 594 (1977) (citing *Angarano v. United States, supra* at 300). "Mere errors in judgment as disclosed by subsequent events or hindsight are not sufficient to establish ineffective assistance." *Id.* (citing *United States v. Hammonds*, 138 U.S.App.D.C. 166, 425 F.2d 597 (1970)); *see Wright v. United States*, D.C. App., 387 A.2d 582 (1978) (decision not to use alibi defense "tactical"); *Williams v. United States*, D.C.App., 374 A.2d 885 (1977) (same).

Appellant argues (1) that trial counsel was on notice that further investigation of an insanity defense, which should have included requesting the appointment of an independent psychiatrist under D.C.Code

[him]." He answered, "Yes." Harper also testified that he had no doubt that appellant was the man.

6. The examinations were made to determine (1) whether appellant was competent to stand trial, and (2) whether, at the time of the alleged offense, and as a result of a mental disease or defect, appellant "lacked substantial capacity either to recognize the wrongfulness of his conduct or to conform his conduct to the requirements of the law." That is the standard for an insanity defense in this jurisdiction. *Bethea v. United States*, D.C.App., 365 A.2d 64, 79 (1976).

7. He stated: "I wouldn't want to raise [the insanity defense], I wasn't nowhere around, and I got nothing to do with that. Because the shooting, I was out in Southeast at the time. If my people [his alibi witnesses] was here, my people are going to tell you the same thing, what I am telling you now. But I can understand what you are about to say because I know it's the law and, so therefore, hey, I just can't understand how the people going to . . . look [me] in [the] face and just say that I did it, because I was–I was out . . . in Southeast when it happened." We note that a defendant enjoys the constitutional right to refuse to raise an insanity defense. *Whalem v. United States*, 120 U.S.App.D.C. 331, 346 F.2d 812 (en banc), *cert. denied*, 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965). *See also Frendak v. United States*, D.C.App., 408 A.2d 364 (1979) (trial court may not force an insanity defense on competent defendant who intelligently and voluntarily decides to forego it).

1978 Supp., § 11–2605(a),[8] was required, and (2) that failure to request such an appointment or to further investigate the basis for the hospital report was grossly incompetent under *Angarano, supra.*

We disagree with both arguments. First, the hospital report, which was furnished to counsel, far from compelling the conclusion that further inquiry was necessary, clearly concluded that an insanity defense would not be productive.[9]　*Cf. Johnson v. United States,* D.C.App., 413 A.2d 499 (1980) (ineffective assistance found when counsel failed to obtain a copy of medical report that he had been informed ten days earlier would have been favorable to defense and crucial to impeaching the credibility of the key government witness–and establishing that at least some of the alleged conduct did not occur); *Gaither v. United States,* D.C.App., 391 A.2d 1364, 1366 (1978) (denial of defense request for appointment of private psychiatrist was an abuse of discretion when counsel told court that St. Elizabeths' staff psychiatrist had informed him that he did not have enough facts "to fully determine whether the alleged offense had been the product of a substantial mental disease or defect").

Appellant's heavy reliance on an undisclosed prior medical staff conference report, on which the hospital's competency and productivity report were based, for his argument that the later report should have been investigated further is misplaced.[10]　Not only were the contents of the prior report

unknown to either the defense or the prosecution, they were also a weak source of support for appellant's argument that he had a substantial insanity defense.

The conference report clearly rejects the hypothesis that appellant's medical history was consistent with an episode of "organic dyscontrol" at the time of the offense. It merely conjectures that, *if* appellant had "a firm history consistent with an organic dyscontrol syndrome," and *if* he had been both 'high' on the drug PCP *and* experiencing seizure activity at the time of the offense," it might be argued that the drug exacerbated the underlying propensity to act out violently　.　.　.." (emphasis added). However, none of these preconditions was found to exist.

■　Since the contents of the underlying hospital reports and the other post–trial material, such as the affidavits in support of appellant's motion for a new trial, were *not* "known or obvious" to counsel by the time of trial, those contents are irrelevant to determining the issue of his trial competence.

■　On these facts, we cannot say, without the benefit of "reflective hindsight" or speculation, *see Thornton v. United States,* D.C.App., 357 A.2d 429, 434–35 (1976), that appellant's trial counsel's decision not to pursue an insanity defense demonstrated the gross incompetence that warrants reversal for ineffective assistance of counsel.[11]

**8.** In *Gaither v. United States,* D.C.App., 391 A.2d 1364, 1367–68 (1978), we set forth the standard for determining whether expert psychiatric services are "necessary to an adequate defense" under § 11–2605(a): "[t]he question before the trial court is not whether the defendant was insane at the time he committed the offense, but whether the evidence of mental disorder is such that a reasonable attorney would pursue an insanity defense. * * * In making this determination, the trial court should tend to rely on the judgment of defense counsel who has the primary duty of providing an adequate defense." (citations omitted).

**9.** We do not mean to imply, of course, that a court-ordered report is dispositive on this question, only that *this* report did not clearly put

counsel on notice that further investigation must be done.

**10.** There is no indication in this record that counsel had any information which might have placed him on notice that further investigation of the insanity defense was necessary or advisable, other than the hospital report (and his familiarity with the facts of the case).

**11.** Appellant also argues that trial counsel was unaware that he could raise both an alibi and an insanity defense (by means of a bifurcated trial) and that this ignorance was both a sign of gross incompetence and the principal reason that he abandoned the insanity defense. The evidence in the record supports neither conclusion. *See* note 7 *supra. Compare Thornton v. United States, supra* at 436: "Where counsel is

*Brady Materials*

There are three situations when violation of the due process doctrine enunciated in *Brady v. Maryland, supra,* requires a new trial. *See Brown v. United States,* D.C.App., 372 A.2d 557 (1977).

The first situation arises when a conviction reasonably could have been produced by the government's knowing use of perjured testimony. *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). It is inapplicable to this case; appellant's argument that Dalton and Detective Aduddell committed perjury by failing to volunteer the disputed information regarding the photographic arrays is totally without merit.

The second occasion for reversal arises when the government fails to disclose certain specifically requested evidence, favorable to the accused, that might have affected the outcome of the trial. *See* Super.Ct.Cr.R. 16–II. There was no evidence of a request in this case. Appellant's argument that trial counsel "implicitly" requested the information when he examined Officer Aduddell at a pretrial hearing and, later at trial, is without merit. *Brady* requires the defense to make a demand that clearly puts the government on notice of its duty to produce.[12]

Under the third *Brady* standard, if the government fails to turn over unrequested exculpatory evidence, a new trial is warranted "only if the omitted evidence creates a reasonable doubt [as to appellant's guilt] . . . which otherwise would not exist." *Brown v. United States, supra* at 560. A "mere possibility that an item of undisclosed information might have helped the defense or . . . affected the outcome of the trial" is insufficient. *Agurs v. United States,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). The evidence must be turned over only if it is obviously exculpatory or clearly supportive of a claim of innocence.

Furthermore, any "omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." *Id.* at 112–13, 96 S.Ct. at 2402.

Given the ample identification evidence by Harper and the lucidity and conscientiousness of Dalton's other, independent, identifications of appellant, in court and elsewhere, we discern no reasonable likelihood that either knowledge of the challenged photographic array procedure or testimony regarding that procedure would have created a reasonable doubt as to appellant's guilt.

*Affirmed.*

---

prepared to defend his client, and considers but declines to make certain pretrial motions, mere allegations [of ineffectiveness] because he 'failed' to make them are insufficient to justify reversal." (citations omitted). Contrast these facts with those in *Johnson v. United States, supra.*

12. The burden is on the defendant to convince the court that he made the proper request and that the government denied it. *Cf. Rosser v. United States,* D.C.App., 381 A.2d 598, 604–05 (1977) (defendant's obligation to make Rule 16 request ceased when prosecutor falsely represented that the defendant's statements were all exculpatory and oral). We have recommended that Rule 16 requests be made and answered in writing to obviate the type of problems presented in this appeal. *Id.* at 610.